## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## SOUTH BEND DIVISION

LEONARD THOMAS,                    )
        Plaintiff,              )
                     )
    v.                                    )   CAUSE NO.: 3:21-CV-448-JVB-JEM
                     )
GEO GROUP INC., *et al.*,          )
        Defendants.           )

### OPINION AND ORDER

Leonard Thomas, a prisoner without a lawyer, is currently incarcerated at the Miami Correctional Facility. He filed a complaint regarding a variety of issues. (ECF 1). "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation marks and citations omitted). Nevertheless, pursuant to 28 U.S.C. § 1915A, the Court must review the merits of a prisoner complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.

### LITIGATION HISTORY

Thomas's complaint is sixty-seven pages long and includes an additional one-hundred-sixteen pages of attachments. He has sued ninety-seven defendants for events that allegedly occurred from April 2016 through June 2021. Thomas, who alleges he is mentally ill, has a lengthy litigation history. He lists twelve previous cases, two of which were consolidated and remain pending in the Northern District of Indiana before this Court. *See Thomas v. Wardell, et. al.*, 3:15-CV-548-JVB-JEM (filed. Nov. 20, 2015) (the "2015 INND suit") and *Thomas v. Hendrix, et al.*, 3:18-CV-803-JVB-JEM (filed Sept. 28, 2018) (the "2018 INND suit"). He also states the instant

case was originally filed in the Southern District of Indiana in 2019 (*see Thomas v. GEO Group, Inc.*, *et al.*, 1:19-CV-016-RLY-DLP, filed Jan. 2, 2019) (the "2019 INSD suit") because he was "mislead and misguided by his counselor defendant Whittinghill into filing this alleged complaint in the wrong district." (ECF 1 at 15). An order was entered dismissing that case without prejudice as abandoned for failure to prosecute after Thomas failed to resolve his filing fee status. *See Thomas*, 1:19-CV-016-RLY-DLP at ECF 7. However, a final judgment, issued and signed by the Honorable Richard L. Young, was entered on March 11, 2019, which noted the action was "**dismissed with prejudice pursuant to 28 U.S.C. § 1915A(b).**" *See id.* at ECF 8 (emphasis in original). Thomas appealed that judgment, but the appeal was dismissed on June 24, 2020, for lack of prosecution. *Id.* at ECF 16.

## FACTS

According to the current complaint, Thomas entered into the Indiana Department of Correction (IDOC) in 2007 with preexisting diagnoses of schizophrenia, depression, and epilepsy and has had long-standing issues with mental illness, psychiatric disorders, and suicidal ideations ever since. On April 20, 2016, after three failed suicide attempts at the Westville Correctional Facility's (WCF) Westville Control Unit (WCU Supermax)—which Thomas attributes to decompensation due to 23-hour lockdown in segregation/restricted housing—he was officially re-diagnosed by IDOC as being a prisoner with a serious mental illness (SMI). His mental status classification code was downgraded to F, and he was immediately transferred to the New Castle Correctional Facility (NCCF), one of IDOC's three prisons with Special Needs Housing Units (SNU).

*New Castle Correctional Facility – April 20, 2016 through March 7, 2017*

When he first arrived at NCCF, he asked to speak to a trained mental health nurse during intake, but Nurse Lawson[1] and Dr. Ippel denied that request. On April 22, 2016, Dr. Keris allegedly falsified Thomas's medical records when she noted Thomas had admitted faking his mental illness in order to be transferred out of WCU Supermax. From late April through November of 2016, Thomas attended Psychiatric Dialectical Behavioral Therapy (DBT) facilitated by the GEO Group, Inc. During DBT he was cuffed at the wrists and ankles and forced to sit in a chair for two hours a day (ten hours a week). He was not allowed to wear his medically prescribed back brace underneath his restraints during therapy. In general, he was not permitted to go to the gym or law library, and he was denied visitors. Dr. Brubaker prescribed him Pamelor, an antidepressant. The rest of his medications were discontinued.

Dr. Burdine conducted an out-of-cell interview with him in front of other mentally ill prisoners, wherein she accused him of having a sexual problem with young females and stated he had been arrested for rape and had attempted to murder his cellmate. Thomas denied those allegations, but Dr. Burdine entered the allegations into his electronic medical records. As a result of that interview, he was assaulted by another inmate despite having warned staff of the danger ahead of time.

In November 2016, Dr. Burdine, Dr. Keris, Dr. Pintel, and other members of the GEO Group, Inc.'s mental health staff, revoked Thomas's SMI classification despite being aware of his long-standing mental illness. He was transferred back to WCU Supermax, where he was again placed on 23-hour lockdown in segregation/restricted housing. There, Dr. Eichman and Dr.Taylor prescribed him antipsychotic and antidepressant medications.

---

[1] Nurse Lawson is not named as a defendant in this case.

Thomas alleges IDOC and GEO Group Inc.'s unconstitutional policies, practices, and customs—which permitted mentally ill prisoners to be housed in solitary confinement even if they had recently attempted suicide—denied him adequate mental health care and subjected him to punitive confinement. He also alleges GEO Group, Inc.'s policies were unconstitutional because they forced him to attend DBT classes while restrained. He alleges GEO Group, Inc. has failed to properly train its employees in order to cut costs. He alleges the defendants failed to protect him from the assault by another inmate that occurred while at NCCF. Finally, he alleges Dr. Burdine, Dr. Keris, Dr. Pintel, and Therapist Heimann[2] told him they were transferring him back to WCU Supermax in retaliation for filing lawsuits against them and their colleagues.[3]

The allegations in the complaint jump forward, and Thomas alleges IDOC and GEO Group's unconstitutional policies and practices allowed the defendants to change his mental health code from an F back to a C so that he would be subjected to segregation/restricted housing at WCU Supermax. He alleges the administrative officials in Indianapolis, custody staff officials, and medical/mental health staff were all aware that the adverse conditions of confinement at WCU Supermax would pose an atypical hardship on him because of his mental health issues, yet they decided to send him there anyway.

*Westville Correctional Facility, Westville Control Unit Supermax – March 7, 2017, through March 9, 2021*

When Thomas arrived at WCU Supermax on March 7, 2017, he was immediately placed on suicide watch. He asked to speak to a trained mental health nurse during intake, but that request was denied by Nurse Bigheart, Nurse Downing, and Nurse Hutchinson. He describes his cell as

---

[2] Therapist Heimann is not named as a defendant.

[3] Thomas also alleges Officer Criswell told him he has a small penis, for which he was constantly mocked. And, Officer Pearson/Pierson and an unnamed officer allegedly attacked him while he was in handcuffs waiting to be escorted to the group room for DBT.

concrete with a solid steel door and small window. The cells were poorly lit and cold, and the intercom system did not work. The water was contaminated from lead piping. No inmates were allowed to leave those cells without first being shackled, cuffed, and restrained. There was an indoor/outdoor recreational pad with a pull-up bar, a basketball rim, and a ball with no air. Thomas was denied time outside his cell, denied DBT while at WCU Supermax, denied various classes, and denied visitation. He alleges his suicidal ideations worsened.

He alleges WCU Supermax was understaffed—there was only a fourteen-man security staff per twelve-hour shift, one doctor available on Tuesdays and Thursdays, one nurse per twelve-hour shift, one on-call psychiatrist/psychologist, and two mental health professionals per two-hundred-twenty-four inmates. He alleges IDOC and Wexford of Indiana attempted to save money by not adequately hiring/training staff and by discontinuing his psychotropic medication and only re-starting it after several failed suicide attempts.

From March 2017 to March 2018, Thomas met with Dr. Eichman nine times regarding his medication management and/or psychotherapy. She admitted to him that she had received his healthcare request forms. He requested that the meetings be conducted in private, but she denied those requests. He informed her he was hearing voices, the walls seemed to be closing in on him, he was seeing demons, and he could not sleep. She restarted his psychotropic medications, antipsychotics, and antidepressants. Despite being on medication, he attempted to commit suicide on March 16, 2018, and again in late September of 2018. Thomas alleges he submitted hundreds of healthcare request forms during that time and late March of 2020, but he did not receive any help from Dr. Eichman, Dr. Taylor, Dr. Wala,[4] and mental health professionals Mr. Faenza, Ms.

---

[4] Dr. Wala is not listed as a defendant in this case, but she was listed as a defendant in the 2019 INSD suit.

Keeton,[5] Mr. Usdowski, and Ms. Boren. Instead, he was written up for excessive submissions and sanctioned with more time in segregation.

Beginning in August of 2018, Dr. Wala directed that inmates on suicide watch should not receive blankets or mattresses. Thomas alleges he was forced to sleep on the floor on and off for years in a receiving area, where he was monitored by "suicide companions" every fifteen minutes, twenty-four hours a day. There was no toilet, no bunk, and no sink. (ECF 1 at 43). Pests crawled on him, and the lights in the garage area next door stayed on day and night. He also alleges that between August 2018 and March 2020, he slept on a steel bunk with no mattress or blanket, and he was also placed in a cell with a camera "for days and weeks" where pests crawled on him all night. *Id*.

He has sued for unconstitutional policies related to his housing placement and for being deliberately indifferent to his mental health needs for over four years, which resulted in numerous suicide attempts.

Thomas also alleges that from January 2015 through March 2021, he was forced to drink water that was contaminated by the lead piping system at WCF and WCU Supermax, which caused him to have fevers, diarrhea, stomach pains, headaches, dizziness, and blackouts. Dr. Liaw gave him intravenous shots and placed him on medication two separate times, but it did not fix the issues he was having. He alleges all of the defendants knew about the contamination—going so far as to drink bottled water themselves—but did not allow the inmates to do the same.

---

[5] Ms. Keeton is not listed as a defendant, but she was listed as a defendant in the 2019 INSD suit.

*Miami Correctional Facility March 9, 2021, through June 16, 2021*

On March 9, 2021, Thomas was transferred to the Miami Correctional Facility (MCF), where he was placed in a segregated/restricted housing unit on suicide watch.[6] The cell had no camera and no back window. Upon intake, he asked to speak with a mental health nurse, but he was denied by Nurse Hill and Dr. Muranda. On March 10, 2021, he met with mental health professional Ms. Miller-Sweet[7] and told her he felt suicidal, but she did not take any action. Later that day, he told Sgt. Martin[8] he felt suicidal, but Sgt. Martin ignored him. At 4:30 PM, Thomas attempted suicide. He was transferred to the infirmary for medical treatment and placed on suicide watch by Nurse Sherry. However, the cell he was immediately returned to had no camera or suicide companion. On March 12, 2021, he told Ms. Miller-Sweet that the walls were closing in on him, he could not breathe, he was seeing demons and hearing voices telling him to cut his wrist, he and could not sleep. She told him to ignore the voices and use coping skills. He was then sprayed with pepper spray and told to stop cutting himself with razor blades; it is unclear who deployed the pepper spray. He was handcuffed and taken back to the infirmary for medical treatment. Thomas asked to speak with Dr. Cisse, but he was denied. Ms. Miller-Sweet failed to write a report regarding the incident. He was returned to the same cell without cameras or a suicide companion.

On March 17, 2021, he was scheduled for a tele-visit with Dr. Cisse. He asked that the visit be conducted in private, but Ms. Miller-Sweet and two correctional officers remained in the room. Dr. Cisse asked if he was still hearing voices, and Thomas told her he was. Dr. Cisse placed him back on Haldol, an antipsychotic, to try to calm the voices. Thomas asked to be transferred to

---

[6] According to Thomas, Mental Health Professional Ms. Quinn and Caseworker White told him he was going to be transferred in retaliation for filing lawsuits. Neither are named as defendants.

[7] Ms. Miller-Sweet is listed as K. M. Sweet in the caption of the complaint.

[8] Sgt. Martin is not named as a defendant.

another facility with specialized mental treatment services due to his long-standing mental health issues, but Dr. Cisse and Ms. Miller-Sweet denied that request. He was not given any therapy and was taken off suicide watch five days later.

On March 22, 2021, Thomas personally informed Unit Team Manager N. Angle of his history of mental illness and SMI diagnosis and explained he was feeling "closed in" and suicidal because his cell did not have a back window. *Id*. at 55. Thomas asked to be moved to a different cell with a window, but Mr. Angle told him to fill out a request for interview and took no action.

On April 4, 2021, Thomas attempted suicide by hanging. He was immediately taken to the infirmary due to complications breathing. Nurse Sherry informed mental health staff of the situation, and he was placed back on suicide watch. He was returned to segregation/restricted housing status in a suicide smock and had no mattress or blanket pursuant to the mental health staff's orders.

On April 5, 2021, Thomas informed Mr. Angle he was worried about his housing situation due to "bedmoves." *Id*. at 56. Sgt. Beane, Officer Kennedy, Officer Kirby, and Officer Anderson[9] placed a gang-affiliated inmate, Offender Walker, in the cell with him while he was on suicide watch. Thomas alleges he informed Mr. Angle he had several altercations in the past with Offender Walker, so he requested protective custody papers but was denied. He was injured during two separate altercations with Offender Walker in the cell on April 5th. Neither Mr. Angle nor the officers did anything to prevent the fights. In fact, they placed him back with Offender Walker after to the first incident to "see who would win." *Id*. at 57. Documentation of Thomas's injuries were lost, and he was written up for battery. That same day, Thomas suffered two grand mal seizures; he was escorted to medical and given pain medication.

---

[9] None of these officers are named as defendants.

Afterwards, he was taken back to the segregated/restricted housing unit and placed with a different offender who had also complained about the conditions at MCF. Thomas alleges the cell had been "condemned" for over two months. *Id.* at 59. There were no lights, "one month old toilet water" was on the floor, chemical spray was all over the back of the door, walls, toilet, and sink area, and the intercom was broken. His written complaints to the MCF Internal Affairs Office and the ombudsman about the conditions were ignored.

Thomas alleges that on April 5, 2021, his prescribed psychotropic, antipsychotic, and antidepressant medications were abruptly discontinued. He informed Ms. Miller-Sweet, Ms. Alexander, Dr. Verdon, and Dr. Cisse of this fact via multiple healthcare request forms, but they did not respond. Thomas alleges he told the defendants he cannot sleep, is hearing voices telling him to harm himself, is seeing demons, feels depressed, and feels the walls are closing in on him, but nothing has been done. He states that between April 5, 2021, and June 4, 2021, he was forced to reside in the segregated/restricted housing unit despite the fact that he had informed Warden Hyatte, Assistant Warden Payne, Assistant Warden Scaife, Unit Team Manager N. Angle, Case Manager Matthew, Case Manager Hamrick, Case Worker Isaac, and Caseworker Croft that he was hearing voices telling him to kill himself and that they knew about his previous SMI issues. Thomas claims the defendants failed to protect him from self-harm and were deliberately indifferent to his mental health needs when they forced him to remain in "punitive, prolonged, isolated, solitary confinement" despite other available options better suited to his mental health issues. *Id.* at 62. He brings policy claims against various defendants. Thomas requests monetary damages and that a declaratory injunction be issued.

## ANALYSIS

### *Res Judicata*

Because Thomas admits this lawsuit was originally filed and disposed of with prejudice in the Southern District of Indiana, the Court must first examine the claims in light of res judicata. "The doctrine of *res judicata*, or claim preclusion, 'protects the finality' of a judgment and 'prevents parties from undermining it by attempting to relitigate the claim.'" *McDonald v. Adamson*, 840 F.3d 343, 346 (7th Cir. 2016) (citing *Palka v. City of Chicago*, 662 F.3d 428, 437 (7th Cir. 2011)). There are several requirements for res judicata to apply: "(1) an identity of the parties or their privies; (2) an identity of the causes of actions; and (3) a final judgment on the merits." *Hwy. J Citizens Group v. U.S. Dept. of Transp.*, 456 F.3d 734, 741 (7th Cir. 2006) (quoting *Cent. States, S.E. & S.W. Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 628 (7th Cir. 2002)). If these requirements are met:

> res judicata bars not only those issues which were actually decided in a prior suit, but also all issues which could have been raised in that action. Simply put, the doctrine of res judicata provides that, when a final judgment has been entered on the merits of a case, it is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.

*Id*. (internal quotation marks, italics, and citations omitted).

Turning first to the identity of the causes of actions, it is clear many of Thomas's current claims fall squarely within the confines of the 2019 INSD suit. The claims related to Thomas's stay at NCCF from April 20, 2016, through March 7, 2017, are essentially substantively identical. In both cases, Thomas describes his mental health treatment—or lack thereof—after his transfer from WCU Supermax to NCCF. He faults GEO Group, Inc. and its employees, along with prison administrative and custody staff officials, for subjecting him to cruel and unusual punishment

10

during DBT therapy (while being aware of his chronic physical and emotional issues) and having practices and policies in place that prevented SMI prisoners like himself from getting adequate treatment and/or participating in facility recreation, educational, and other programs. He attributes this, in part, to a lack of employee training and to outright intentional discrimination, which culminated in a retaliatory transfer back to WCU Supermax. *Compare supra*, at 3–5, *with Thomas*, 1:19-CV-016-RLY-DLP at ECF 1 at 12–19. The earlier lawsuit also explicitly describes the alleged attack by Officer Pierce/Pearson/Pierson mentioned in footnote 3 above. *See Thomas, id*. at 19–20.

The same is true of the allegations pertaining to Thomas's stay at WCU Supermax after his transfer there on March 7, 2017. The 2019 INSD suit describes the conditions of his confinement at WCU Supermax, including 23-hour segregated lockdown in cells that were small, poorly ventilated, and unsanitary. He describes contaminated water that made him ill. He blames policies and practices instituted and carried out by IDOC officials in Indianapolis along with actions taken by mental health professionals, nurses, and administrative, custody, and security staff at WCF that subjected him to the harsh conditions and lack of adequate treatment there. He asserts the defendants were aware of his physical and mental health issues but failed to address his worsening psychological state which ultimately culminated in several suicide attempts. *Compare supra*, at 5–8, *with Thomas*, 1:19-CV-016-RLY-DLP at ECF 1 at 20–26. Thus, for all of the claims described above, there is sufficient identity to raise res judicata concerns. *See Hwy. J Citizens Group*, 456 F.3d at 741 (if a claim "emerges from the same core of operative facts as that earlier action," it has sufficient "identity" with the previously litigated matter) (citation omitted).[10]

---

[10] Although the 2019 INSD suit's allegations cease as of December 3, 2018—the date Thomas signed his complaint—and the current allegations pertaining to his stay at WCU Supermax run through March 9, 2021, nothing in his new complaint regarding WCU Supermax exceeds the scope of issues that could have been raised in the original action. *See Hwy. J Citizens Group*, 456 F.3d at 741. His specific allegations regarding the timeframe at WCU Supermax

As to the identity of the parties regarding those claims, many of the defendants directly overlap the two cases. And, for those in the current suit who were not named in the 2019 INSD suit, it is clear that privity exits as they were all employed by either IDOC or its medical service providers. Privity of parties exists when there is a "link between parties in successive suits which share a "clear congruence of legal issues." *Tartt v. Northwest Cmty. Hosp.*, 453 F.3d 817, 823 (7th Cir. 2006) (citing *Studio Art Theatre of Evansville, Inc. v. City of Evansville*, 76 F.3d 128, 131 (7th Cir. 1996)). Such is the case here.

Finally, the 2019 INSD suit constitutes a final judgment on the merits for purposes of res judicata. Although the original dismissal order indicated the 2019 INSD case was dismissed as abandoned for failure to prosecute, the final judgment—which was signed by the judge—indicates it was dismissed with prejudice pursuant to 28 U.S.C. § 1915A(b), which states in part that, upon review, a court must "dismiss the complaint . . . if [it] is frivolous, malicious, or fails to state a claim upon which relief may be granted [or] seeks monetary relief from a defendant who is immune from such relief." Whether the 2019 INSD suit was dismissed for failure to prosecute or because the complaint was lacking in some respect, it is clear that the final judgment was with prejudice. And, either way, an entry of judgment dismissing the case for failure to state a claim or for a failure to prosecute or comply with a court order "amounts to a final judgment on the merits for res judicata purposes." *Tartt v. Northwest Cmty. Hosp.*, 453 F.3d 817, 822 (7th Cir. 2006). If Thomas

---

between the filing of the 2019 INSD suit and March 9, 2021, are exceedingly sparse, and he has not plausibly alleged any independent constitutional violations against any of the named defendants. *See Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (internal quotation marks and citation omitted). Moreover, even if he had alleged sufficient details to support a claim for events that occurred at WCU Supermax between the filing of the INSD suit and March 9, 2021, they would belong in a separate lawsuit unless Thomas could plausibly link them to this one. *See George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) ("Unrelated claims against different defendants belong in different suits . . . .").

felt that final judgment was entered in error, his remedy was to appeal that case, not to bring a new suit.[11]

Thus, all claims (and related defendants from NCCF and WCF) pertaining to Thomas's stay at NCCF from April 20, 2016, through March 7, 2017, and at WCU Supermax from March 7, 2017, through March 9, 2021, will be dismissed because they are barred by res judicata.[12]

*Remaining Claims*

This leaves Thomas's current claims regarding MCF from March 9, 2021, to June 16, 2021.[13] Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To state a claim, a prisoner must allege (1) he had an objectively seriously medical need and (2) the defendant acted with deliberate indifference to that medical need. *Id.* A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). On the second prong, inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. This includes appropriate measures to address the risk of

---

[11] In fact, as noted above, Thomas did appeal that judgment, but the appeal was dismissed for lack of prosecution.

[12] Although Thomas lists Psychiatrist Vicki E. Burdine, Psychiatrist Walter Pintel, PhD Eddie Taylor, Psychiatrist Barbara Eichman, and Nurse Practitioner Barbara Brubaker as having the same address as the IDOC administrative officials in the central office in Indianapolis in the caption, he specifically describes them as being medical professionals who treated him at WCU Supermax or NCCF—and not in connection with his time at MCF—in the body of his complaint. *See* ECF 1 at 22–23, 25–27, 30, 40–42. PysD Deanna Dwenger is named only twice in the body of the complaint as part of a long list of defendants who allegedly caused him harm while he was at WCU Supermax and/or NCFF, but it is unclear what her role was as he does not describe her actions in any way. *See id.* at 27–28, 47–48. Accordingly, these medical defendants will be dismissed. Similarly, Thomas names IDOC Regional Director Beck Hess in the caption, but she is only mentioned in the body of the complaint with regard to the lead water pipe issue at WCU Supermax, which is covered under the scope of the 2019 INSD suit. As such, she will also be dismissed.

[13] June 16, 2021, is the date Thomas signed his complaint. ECF 1 at 67.

self-harm from suicide. *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 565 (7th Cir. 2021).

Courts generally "defer to medical professionals' treatment decisions unless there is evidence that

no minimally competent professional would have so responded under those circumstances."

*Walker*, 940 F.3d at 965 (citation and internal quotation marks omitted).

At the same time, a prisoner is not required to show that he was "literally ignored" to

establish deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

"[I]nexplicable delay in responding to an inmate's serious medical condition can reflect deliberate

indifference," particularly where "that delay exacerbates an inmate's medical condition or

unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citations

and internal quotation marks omitted). Additionally, a "prison physician cannot simply continue

with a course of treatment that he knows is ineffective in treating the inmate's condition." *Arnett*

*v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011).

Here, Thomas has alleged a serious medical need, namely, severe mental illness that has

led him to make several suicide attempts while at MCF. He asserts Nurse Hill, Dr. Muranda, Ms.

Miller-Sweet, Nurse Sherry, Dr. Cisse, Ms. Alexander, and Dr. Verdon—all of whom are

described as either medical or mental health professionals at MCF—were aware of his worsening

condition after his arrival yet failed to provide him with constitutionally adequate mental health

treatment and/or failed to appropriately address his risk of self-harm. Additionally, Thomas alleges

Warden Hyatte, Assistant Warden Payne, Assistant Warden Scaife, Unit Team Manager Angle,

Case Manager Matthew, Case Manager Hamrick, Caseworker Isaac, and Caseworker Croft—all

of whom are described as prison officials or employees at MCF—knew about his past SMI issues

and were personally informed Thomas was experiencing suicidal ideations[14] due to his lack of

---

[14] He states he informed them he was "hearing voices commanding [him] to kill [himself]." (ECF 1 at 61).

treatment and harsh living conditions at MCI yet acted with deliberate indifference to his serious medical needs by failing to take any action to address the problems and by forcing him to reside in administrative segregation in MCF's A-Housing Unit.[15] Giving Thomas the benefit of the inferences to which he is entitled at this stage, he will be permitted to proceed past the pleading stage against these defendants in their individual capacities on Eighth Amendment deliberate indifference grounds for monetary damages.[16]

Similarly, Thomas alleges Commissioner Robert E. Carter, Jr., Deputy Commissioner James Basinger, Executive Director of Classification Jack Hendrix, Director of Mental Health Cara Misetic, Executive Director of Mental Health Mark Levenhagen, and Director of Special Needs Population Amy Eichmeier[17]—all described as IDOC administrative staff officials in the central office in Indianapolis—had access to his medical and clinical records and held "periodic reviews" with MCF prison officials and Wexford's medical and mental health staff, but they all refused to assist him even though they were aware of his "suicidal ideations and the potential triggers concerning those mental illnesses." *Id*. at 19, 24, 47–48. In fact, according to Thomas, they were responsible for his "punitive, prolonged, isolated, solitary confinement" type placement at MCF—a facility with no specialized mental health treatment options onsite even though IDOC

---

[15] He alleges the same of Sgt. Martin, but he is not named as a defendant, so there are no claims stated against him.

[16] That said, Thomas does not describe any actions by Caseworker Carter, Nurse Chad, Nurse Wood, Nurse Emmila, Nurse Jones, Nurse S. Lapoint, and Nurse T. Donin in his complaint. Other than the caption, they are only listed with a long string of defendants alleged to have violated his rights. *See* ECF 1 at 63–64. Without more, he has not stated any plausible claims against them. *See Bissessur v. Indiana Univ. Bd. of Trs*., 581 F.3d 599, 602 (7th Cir. 2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (internal quotation marks and citation omitted); *see also George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Only persons who cause or participate in the violations are responsible.").

[17] Thomas also names IDOC's former Commissioner, Bruce Lemmon, as a defendant. However, according to IDOC's website, Lemmon announced his retirement effective November 30, 2016, long before the events at or associated with MCF are alleged to have occurred. *See* https://www.in.gov/idoc/files/IDOC-COMMISSIONER-BRUCE-LEMMON-HANGS-UP-THE-KEYS-AFTER-40-YEARS.pdf (last visited March 8, 2022). As such, he will be dismissed from this lawsuit.

has other facilities with such specialized units available—which they knew or should have known would exacerbate his mental condition and lead to the suicidal ideations he experienced. *Id*. at 61. Although further investigation may show a lack of personal involvement by these officials, giving Thomas the benefit of the inferences to which he is entitled at this stage, he will be permitted to proceed past the pleading stage against these defendants in their individual capacities on Eighth Amendment deliberate indifference grounds for monetary damages.[18]

In addition, Thomas's complaint can be read to seek injunctive relief related to his ongoing need for care. Warden Hyatte has both the authority and the responsibility to ensure that inmates at his facility are provided constitutionally adequate medical treatment as required by the Eighth Amendment. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). Therefore, Thomas will be allowed to proceed on an Eighth Amendment claim against Warden Hyatte in his official capacity for injunctive relief related to his ongoing need for mental health treatment.

The Eighth Amendment also imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates" and to "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). However, "prisons are dangerous places," as "[i]nmates get there by violent acts, and many prisoners have a propensity to commit more." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). Therefore, a failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005). Instead, the plaintiff must establish that "the defendant had actual knowledge of an impending harm easily preventable, so

---

[18] Thomas names several IDOC John Doe defendants. *See* (ECF 1 at 8–9). However, they will be dismissed because "it is pointless to include lists of anonymous defendants in federal court; this type of placeholder does not open the door to relation back under Fed. R. Civ. P. 15, nor can it otherwise help the plaintiff." *Wudtke v. Davel*, 128 F.3d 1057, 1060 (7th Cir. 1997) (citation omitted). That said, if Thomas discovers the names of these defendants before any statute of limitations concerns attach, he may seek to amend his complaint to add them if he so desires.

that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010). This is a high standard. As the Seventh Circuit has explained:

> To establish deliberate indifference on the part of the defendants sued individually, [plaintiff] needed to show that the officers acted with the equivalent of criminal recklessness, in this context meaning they were actually aware of a substantial harm to [plaintiff's] health or safety, yet failed to take appropriate steps to protect him from the specific danger. [Plaintiff] testified during his deposition that he told officers twice . . . that he was afraid for his life and he wanted to be transferred off the tier. . . . In *Butera*, we deemed the inmate's statements insufficient to give notice to the officers because they did not provide the identities of those who threatened the inmate, nor state what the threats were. . . . This lack of specificity falls below the required notice an officer must have for liability to attach for deliberate indifference.

*Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008) (internal citations and footnote omitted). In addition, "negligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to establish an Eighth Amendment violation. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020).

Here, Thomas alleges he personally informed Mr. Angle that his life was in danger because he had been placed in a cell with a specific, gang-affiliated inmate whom he'd had several previous altercations with. Mr. Angle refused to give him paperwork to request protective custody, and he was subsequently beaten by the other inmate. Instead of intervening at that point, Mr. Angle placed him back in the same cell with the other inmate, and Thomas was beaten again.[19] Giving Thomas the benefit of the inferences to which he is entitled at this stage, he has plausibly alleged Mr. Angle had actual knowledge of an easily preventable impending harm when he was attacked by Offender Walker on April 5, 2021, and he failed to prevent it. Therefore, Thomas will be allowed to proceed

---

[19] He alleges the same of Sgt. Beane, Officer Kennedy, Officer Kirby, and Officer Anderson, but they are not named as defendants, so there are no claims stated against them.

on an Eighth Amendment failure to intervene claim against Mr. Angle in his individual capacity for monetary damages.

Thomas also complains about the conditions of the specific cell he was confined in after he was attacked by Offender Walker. The Eighth Amendment prohibits conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citations omitted). In evaluating an Eighth Amendment claim, courts conduct both an objective and a subjective inquiry. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong asks whether the alleged deprivation is "sufficiently serious" that the action or inaction of a prison official leads to "the denial of the minimal civilized measure of life's necessities." *Id*. (citations omitted). Although "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), inmates are entitled to adequate food, clothing, shelter, bedding, hygiene materials, and sanitation. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). On the subjective prong, the prisoner must show the defendant acted with deliberate indifference to the inmate's health or safety. *Farmer*, 511 U.S. at 834. As the Seventh Circuit has explained:

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotation marks omitted).

Thomas alleges the new cell he was assigned to had been condemned for over two months and had no lights, standing toilet water on the floor, chemical spray on the walls, and no intercom. Even if these allegations can be read as sufficient to suggest he was denied the minimal civilized measure of life's necessities while in that cell, he has not plausibly alleged any of the named

18

defendants personally knew of those conditions and failed to remedy them. At most, he has stated his complaints to MCF Internal Affairs and the ombudsman were ignored, but that is not sufficient to state a claim. *See Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) (There is no general liability under 42 U.S.C. § 1983 for supervisors when those who report to them violate a person's constitutional rights.); *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Only persons who cause or participate in the violations are responsible.").

Finally, Thomas alleges that unconstitutional policies, practices, and customs are in place at MCF as promulgated by Wexford of Indiana that have caused him harm. Wexford of Indiana is a private company that was under contract to provide medical care to inmates housed at MCF. A private company performing a state function can be held liable to the same extent as a municipal entity under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). *See Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (*Monell* framework applies to private company providing medical care at correctional facility). But a corporation "cannot be held liable under § 1983 on a *respondeat superior* theory." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). Rather, corporate liability exists only "when execution of a [corporation's] policy or custom . . . inflicts the injury." *Id*. A corporation can be held liable for "an express policy that, when enforced, causes a constitutional deprivation." *Id*. Absent an unconstitutional policy, corporate liability may be established with a showing of "a widespread practice that, although not authorized by written law or express [corporate] policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). The policy or custom must be the "moving force behind the deprivation of his constitutional rights." *Johnson v. Cook Cnty.*, 526 F. App'x 692, 695 (7th Cir. 2013).

19

Here, Thomas alleges Wexford had a policy, practice, and/or custom in place at MCF of denying SMI inmates adequate mental health treatment. Specifically, he alleges Wexford's practices, policies, and customs kept SMI prisoners housed in "solitary confinement even if the inmate had recently attempted suicide." (ECF 1 at 30). He describes this confinement as "administrative restrictive punitive solitary confinement for indeterminate periods of time, 23 hours a day in a small cell approximately 13 feet by 6 feet with solid steal [*sic*] box-car doors, a small window, and small cuff-port welded to the door that stays lock [*sic*] 24/24," which caused him harm in the form of decompensation and multiple additional suicide attempts, none of which were appropriately addressed by Wexford. *Id*. at 18. He further alleges Wexford had policies, practices, and/or customs in place that inaccurately and/or inappropriately evaluated and classified the mental health status of SMI inmates which led to improper placement and treatment. Giving Thomas the benefit of the inferences to which he is entitled at this stage, he will be permitted to proceed past the pleading stage against Wexford on a *Monell* claim for having unconstitutional policies, practices, and/or customs in place at MCF related to the classification, placement, and treatment of SMI inmates.[20]

*Miscellaneous Motions*

In addition to his complaint, Thomas filed a motion to appoint counsel. (ECF 6). "There is no right to court-appointed counsel in federal civil litigation." *Olson v. Morgan*, 750 F.3d 708, 711

---

[20] He also seeks to hold various IDOC officials liable in their official capacities for those same policies, practices, and/or customs. "[A]n official capacity suit is another way of pleading an action against an entity of which the officer is an agent." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011). In this case, the entity is IDOC, which is a state agency. Thus, the Eleventh Amendment bars these official capacity claims for monetary damages. *See Thomas v. Illinois*, 697 F.3d 612, 613 (7th Cir. 2012) ("The suit is against a state and a state agency and Congress did not abrogate the states' sovereign immunity from suit under section 1983, as it could have done.") (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66–70 (1989)); *see also Meadows v. State of Ind.*, 854 F.2d 1068, 1069 (7th Cir. 1998) ("The [Eleventh] amendment specifically bars official-capacity suits against state officials because the state is the real party in interest in such suits.").

(7th Cir. 2014) (*citing Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007)). However, in some circumstances, the Court may ask counsel to volunteer to represent indigent parties.

> When confronted with a request under § 1915(e)(1) for pro bono counsel, the district court is to make the following inquiries: (1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?

*Pruitt v. Mote*, 503 F.3d at 654.

Here, there is no indication Thomas has made any attempt to obtain counsel on his own, so the motion could be denied on that basis alone. "If . . . the indigent has made no reasonable attempts to secure counsel . . ., the court should deny any [such requests] outright." *Jackson v. County of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992); *see also Pruitt*, 503 F.3d at 654; and *Bracey v. Grondin*, 712 F.3d 1012, 1016 (7th Cir. 2013).

However, the claims Thomas will be proceeding on in this case are similar to those in the 2015 INND suit and the 2018 INND suit currently pending before this court—both of which Thomas has obtained court-appointed counsel for—and it does not appear his situation has meaningfully changed since counsel was appointed in those cases. Thus, in the interests of justice, the motion will be granted to the extent the Court will attempt to find a lawyer willing to represent him.[21] However, the Court cannot require a lawyer to accept an appointment in this case, and finding volunteers is often difficult. It is also possible a lawyer will take this case only if Thomas agrees to enter into a reasonable fee agreement. Until a lawyer enters an appearance on behalf of Thomas, he will continue representing himself without a lawyer because he has not made any

---

[21] However, to the extent the title of the motion suggests that the court should appoint counsel for the sole purpose of filing a motion for a temporary restraining order or a preliminary injunction, it will be denied. If a lawyer enters an appearance on Thomas's behalf, it will be up to his or her discretion to file whatever motions are deemed necessary upon review of this case.

attempt to obtain counsel on his own and because there is no right to court-appointed counsel. *See Olson*, 750 F.3d at 711 (*citing Pruitt*, 503 F.3d at 649).

Thomas also filed a motion for "approval" to file a motion for a temporary restraining order or preliminary injunction to "stop Centurion's unconstitutional mental health policies, practices, procedures, and wide-spread customs denying him adequate mental health treatment." (ECF 7). Thomas does not need "approval" from the Court to file a motion, so it will be denied as unnecessary. Moreover, even if the document could be generously construed as a motion for a preliminary injunction itself, it would be denied. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As to the first prong, "the applicant need not show that [he] definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted).

Here, Thomas has provided no details in his motion as to how he intends to prove the key elements of his case. He simply states he is a prisoner who has been diagnosed with preexisting mental illness and that a "jailhouse lawyer" helped him file the motion. (ECF 7 at 1). More importantly, it appears he seeks relief only against Centurian, who has not been named as a defendant in this case. Therefore, he has not shown a likelihood of success on the merits.

Finally, Thomas filed a motion requesting "the results of a status hearing held on 7-1-21 and a status hearing pursuant to the July 7, 2021 order by the Honorable Chief Judge Justice [*sic*] Jon DeGuilio."[22] (ECF 8 at 2). Although it is not entirely clear, it appears Thomas wishes to inform this Court of the joint hearing in the 2015 INND suit and the 2018 INND suit that was held before Magistrate Judge John E. Martin on July 1, 2021. *See Thomas v. Wardell, et. al.*, 3:15-CV-548-JVB-JEM (filed. Nov. 20, 2015) at ECF 109. The Court is aware of the hearing during which a scheduling order was set for those cases. *Id*. To the extent Thomas is requesting a status hearing in this case to set a similar scheduling order, that request will be denied. Because the case has just been screened and no defendants have been served with notice of this lawsuit, and a status hearing is not necessary at this time.

For these reasons, the Court:

(1) **GRANTS** Leonard Thomas leave to proceed against Dr. Muranda, Dr. Cisse, Dr. Verdon, Mental Health Professional K.M. Sweet a/k/a Ms. Miller-Sweet, Mental Health Professional Alexander, Nurse Hill, and Nurse Sherry in their individual capacities for monetary damages for failing to provide him with constitutionally adequate treatment for his severe mental illness in violation of the Eighth Amendment while at the Miami Correctional Facility from March 9, 2021, through June 16, 2021;

(2) **GRANTS** Leonard Thomas leave to proceed against Warden Hyatte, Assistant Warden Payne, Assistant Warden Scaife, Unit Team Manager N. Angle, Case Manager T. Hamrick, Case Manager Matthew, Caseworker J. Isaac, and Caseworker Croft in their individual capacities for monetary damages for being deliberately indifferent to his severe mental illness in violation of the

---

[22] There was no order issued by Judge DeGuilio in either case on July 7, 2021.

Eighth Amendment while at the Miami Correctional Facility from March 9, 2021, through June 16, 2021;

(3) **GRANTS** Leonard Thomas leave to proceed against IDOC Commissioner Robert E. Carter, Jr., IDOC Deputy Commissioner James Basinger, IDOC Executive Director of Classification Jack Hendrix, IDOC Director of Mental Health Cara Misetic, IDOC Executive Director of Mental Health Mark Levenhagen, and IDOC Director of Special Needs Population Amy Eichmeier in their individual capacities for monetary damages for transferring him to the Miami Correctional Facility on March 9, 2021, and being deliberately indifferent to his severe mental illness in violation of the Eighth Amendment while there from March 9, 2021, through June 16, 2021;

(4) **GRANTS** Leonard Thomas leave to proceed against Warden Hyatte in his official capacity for injunctive relief to ensure he receives constitutionally adequate treatment for his severe mental illness while at the Miami Correctional Facility;

(5) **GRANTS** Leonard Thomas leave to proceed against Unit Team Manager N. Angle in his individual capacity for monetary damages for failing to protect him from being attacked by Offender Walker on April 5, 2021, in violation of the Eighth Amendment;

(6) **GRANTS** Leonard Thomas leave to proceed against Wexford of Indiana on a *Monell* claim for having unconstitutional policies, practices, and/or customs in related to the classification, placement, and treatment of seriously mentally ill inmates at the Miami Correctional Facility;

(7) **DISMISSES** all other claims;

(8) **DISMISSES** GEO Group, Inc., Former IDOC Commissioner Bruce Lemmon, IDOC Regional Director Beck Hess, Psychiatrist Vicki E. Burdine, Psychiatrist Walter Pintel, Eddie Taylor, PhD, Psychiatrist Barbara Eichman, Nurse Practitioner Barbara Brubaker, PysD Deanna

Dwenger, Superintendent Keith Butts, Assistant Superintendent Finch, Program Director Traci Sorrell, Supervisor of Classification F. Owens, Unit Team Manager E. Lowe, Caseworker Elisabeth Shelley, Lead Psychologist Ellen Keris, MHP Mary Hermann, MHP Cyintha Stevens, Program Director Michael Osborn, MHP Ms. Black, BHS K. Cox, BHS Allison Bouillon, Dr. Bruce Ippel, BHS A. Smith, BHS Bradley S. Zachary, BHS Scoll R. Hancock, BHS V. Darline, BHS C. Mallender, Lieutenant Driscoll, Correctional Officer Pearson a/k/a Pierson, New Castle Correctional Facility John Doe Number 1, Warden John Galipeau, Former Warden Mark Sevier, Former Warden Mark Levenhagen in that capacity, Assistant Warden Andrew Pazera, Assistant Warden Kennth Gann, Executive Assistant David Leonard, Supervisor of Classification Patrick Kurger, Dr. Andrew Liaw, Dr. A. Shihadeh, Dr. G. Durak, MHP Gloria Potter, MHP Charles Faenza, MHP Michelle Boren, MHP R. Usdowski, Intake Nurse I. Bigheart, Nurse K. Hutchinson, Nurse C. West, Nurse S. Downing, Nurse K. Hammer, Captain J. Smiley, G. Lewis, Lieutenant K. Halloran, Lieutenant J. Washington, Sergeant K. Reed, Sergeant O. M. Guetarraz, Unit Team Manager J. Sayler, Caseworker J. Taylor, Caseworker B. Whittinghill, Caseworker N. Swinford, Caseworker M. White, Caseworker Z. Newhouse, GEO Group, Inc. Policy Maker James Bond, New Castle Correctional Facility Correctional Offier John Doe Number 1, Deputy Commissioner John Doe Number 2, Classification Director John Doe Number 3, Director of Mental Health John Doe Number 4, Director of Special Needs Population John Doe Number 5, Caseworker Carter, Nurse Chad, Nurse Wood, Nurse Emmila, Nurse Jones, Nurse S. Lapoint, and Nurse T. Donin;

(9) **DIRECTS** the clerk to request Waiver of Service from (and if necessary, the United States Marshals Service to serve process on) IDOC Commissioner Robert E. Carter, Jr., IDOC Deputy Commissioner James Basinger, IDOC Executive Director of Classification Jack Hendrix, IDOC Director of Mental Health Cara Misetic, IDOC Executive Director of Mental Health Mark

Levenhagen, and IDOC Director of Special Needs Population Amy Eichmeier, Warden Hyatte, Assistant Warden Payne, Assistant Warden Scaife, Unit Team Manager N. Angle, Case Manager T. Hamrick, Case Manager Matthew, Caseworker J. Isaac, and Caseworker Croft at the Indiana Department of Correction, with a copy of this order and the complaint (ECF 1), pursuant to 28 U.S.C. § 1915(d);

(10) **DIRECTS** the clerk to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Dr. Muranda, Dr. Cisse, Dr. Verdon, Mental Health Professional K.M. Sweet a/k/a Ms. Miller-Sweet, Mental Health Professional Alexander, Nurse Hill, and Nurse Sherry at Wexford of Indiana, LLC, with a copy of this order and the complaint (ECF 1), pursuant to 28 U.S.C. § 1915(d);

(11) **ORDERS** the Indiana Department of Correction and Wexford of Indiana, LLC, to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information;

(12) **ORDERS**, pursuant to 42 U.S.C. § 1997e(g)(2), IDOC Commissioner Robert E. Carter, Jr., IDOC Deputy Commissioner James Basinger, IDOC Executive Director of Classification Jack Hendrix, IDOC Director of Mental Health Cara Misetic, IDOC Executive Director of Mental Health Mark Levenhagen, and IDOC Director of Special Needs Population Amy Eichmeier, Warden Hyatte, Assistant Warden Payne, Assistant Warden Scaife, Unit Team Manager N. Angle, Case Manager T. Hamrick, Case Manager Matthew, Caseworker J. Isaac, Caseworker Croft, Wexford of Indiana, Dr. Muranda, Dr. Cisse, Dr. Verdon, Mental Health Professional K.M. Sweet a/k/a Ms. Miller-Sweet, Mental Health Professional Alexander, Nurse Hill, and Nurse Sherry to respond, as provided for in the Federal Rules of Civil Procedure and

N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order;

(13) **GRANTS** the motion for counsel (ECF 6) to the extent the Court will attempt to find a lawyer to take this case;

(14) **DENIES** the motion for approval (ECF 7); and

(15) **DENIES** the motion for a status hearing (ECF 8).

SO ORDERED on March 21, 2022.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN, JUDGE
UNITED STATES DISTRICT COURT