**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| LEONARD THOMAS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:21-CV-448-JVB-JEM |
| | ) | |
| WEXFORD OF INDIANA, *et al.*, | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Leonard Thomas, a prisoner without a lawyer, initiated this case by filing a 67-page complaint,

with an additional 116 pages of exhibits, naming 97 defendants [DE 1]. The Court screened his

complaint and allowed him to proceed as follows:

(1) GRANTS Leonard Thomas leave to proceed against Dr. Muranda, Dr.
Cisse, Dr. Verdon, Mental Health Professional K.M. Sweet a/k/a Ms. Miller-Sweet,
Mental Health Professional Alexander, Nurse Hill, and Nurse Sherry in their
individual capacities for monetary damages for failing to provide him with
constitutionally adequate treatment for his severe mental illness in violation of the
Eighth Amendment while at the Miami Correctional Facility from March 9, 2021,
through June 16, 2021;

(2) GRANTS Leonard Thomas leave to proceed against Warden Hyatte,
Assistant Warden Payne, Assistant Warden Scaife, Unit Team Manager N. Angle,
Case Manager T. Hamrick, Case Manager Matthew, Caseworker J. Isaac, and
Caseworker Croft in their individual capacities for monetary damages for being
deliberately indifferent to his severe mental illness in violation of the Eighth
Amendment while at the Miami Correctional Facility from March 9, 2021, through
June 16, 2021;

(3) GRANTS Leonard Thomas leave to proceed against IDOC Commissioner
Robert E. Carter, Jr., IDOC Deputy Commissioner James Basinger, IDOC Executive
Director of Classification Jack Hendrix, IDOC Director of Mental Health Cara
Misetic, IDOC Executive Director of Mental Health Mark Levenhagen, and IDOC
Director of Special Needs Population Amy Eichmeier in their individual capacities for
monetary damages for transferring him to the Miami Correctional Facility on March
9, 2021, and being deliberately indifferent to his severe mental illness in violation of
the Eighth Amendment while there from March 9, 2021, through June 16, 2021;

(4) GRANTS Leonard Thomas leave to proceed against Warden Hyatte in his
official capacity for injunctive relief to ensure he receives constitutionally adequate
treatment for his severe mental illness while at the Miami Correctional Facility;

(5) GRANTS Leonard Thomas leave to proceed against Unit Team Manager
N. Angle in his individual capacity for monetary damages for failing to protect him

1

from being attacked by Offender Walker on April 5, 2021, in violation of the Eighth
Amendment;

(6) GRANTS Leonard Thomas leave to proceed against Wexford of Indiana
on a Monell claim for having unconstitutional policies, practices, and/or customs in
related to the classification, placement, and treatment of seriously mentally ill inmates
at the Miami Correctional Facility[.]

[DE 12] at 23–24. All other claims and defendants were dismissed. *Id*. at 24–25. Of note, because

Thomas admitted his lawsuit was originally filed and disposed of with prejudice in the Southern

District of Indiana, the Court examined the claims in light of the doctrine of res judicata and

determined that "all claims (and related defendants from NCCF and WCF) pertaining to Thomas's

stay at NCCF from April 20, 2016, through March 7, 2017, and at WCU Supermax from March 7,

2017, through March 9, 2021, will be dismissed because they are barred by res judicata." *Id*. at 10–

13.

The Court agreed to attempt to recruit counsel per Thomas's request (*see id* at 20–22), and

Jonathan R. Slabaugh, a skilled lawyer, graciously entered an appearance on his behalf pursuant to

the District's volunteer attorney program. [DE 25 & 28]. Less than two months later, Attorney

Slabaugh filed a motion to withdraw based on his communications with Thomas. [DE 42]. Attorney

Slabaugh later explained that he had received a message from Thomas "stating that the Plaintiff was

declining the undersigned counsel's representation in connection with this action." [DE 53] at 2. The

Court held a hearing on the matter and ultimately granted the motion. [DE 55 & 58]. During that

hearing, the Court cautioned Thomas that it was "unlikely" the Court would attempt to find another

attorney for him and that proceeding on his own could be "very difficult and complicated," but

Thomas insisted he had "signed an engagement with other attorneys" to represent him and wished to

decline court appointed counsel.

At a subsequent hearing, Thomas orally requested permission to amend his complaint, and the

Court set a deadline for him to file a motion to amend along with the proposed amended complaint.

[DE 59]. Thomas did not do so by the deadline, so the case was stayed and statistically closed in order to allow Thomas time to determine whether he wished to file an amended complaint or whether he wished to proceed on his current claims. *See generally* [DE 60 & 67]. He eventually filed a proposed 254-page amended complaint naming 217 defendants [DE 74-1 & 74-2], and a motion to lift the stay [DE 86], which was granted [DE 97]. That amended complaint is now before the Court.

Under 28 U.S.C. § 1915A, the Court must screen the amended complaint and dismiss it if the action is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. To proceed beyond the pleading stage, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must give a pro se complaint liberal construction. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Rule 8 of the Federal Rules of Civil Procedure requires that a complaint contain a "short and plain statement" showing an entitlement to relief. Fed. R. Civ. P. 8. Under this Rule, plaintiffs need not "lard their complaints with facts." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). A complaint must be drafted in a manner "to avoid requiring a district court or opposing party to forever sift through its pages" to determine "whether a valid claim is alleged and if so what it is." *Jennings v. Emry*, 910 F.2d 1434, 1436 (7th Cir. 1990). The Seventh Circuit has noted that "[d]istrict judges are busy, and therefore have a right to dismiss a complaint that is so long that it imposes an undue burden on the judge, to the prejudice of other litigants seeking the judge's attention." *Kadamovas v. Stevens,* 706 F.3d 843, 844 (7th Cir. 2013). While "surplusage can and should be ignored," a complaint's length may make it unintelligible "by scattering and concealing in a morass of irrelevancies the few allegations that matter." *Id*. (quoting *United States ex rel. Garst v. Lockheed–Martin Corp.,* 328 F.3d

3

374, 378–79 (7th Cir. 2003) (155-page complaint with 400 paragraphs dismissed as having received "more judicial attention than his pleadings deserved")). That said, "[b]revity must be calibrated to the number of claims and also to their character, since some require more explanation than others to establish their plausibility." *Kadamovas,* 706 F.3d at 844.

Here, Thomas's proposed amended complaint is excessively long. He reiterates factual allegations across 254 pages, and he appears to be suing practically every prison employee and official he came across—some 217 of them—in his years spent throughout multiple facilities. Parts of it read like a daily diary, and it's difficult to discern whether every event he complains of is intended to be part of a specific claim. That said, in the interests of justice, the Court will do its best to sift through Thomas's lengthy allegations one additional time in an effort to move this case forward.[1]

**Litigation History**

As in his original complaint, Thomas begins by describing himself as a seriously mentally ill inmate with a long litigation history. He lists twelve previous cases, two of which were consolidated in the Northern District of Indiana before this court. *See Thomas v. Wardell, et. al.*, 3:15-CV-548-JVB-JEM (filed. Nov. 20, 2015) (the 2015 INND suit) and *Thomas v. Hendrix, et al.*, 3:18-CV-803-JVB-JEM (filed Sept. 28, 2018) (the 2018 INND suit). He also states the instant case was originally filed in the Southern District of Indiana in 2019 (*see Thomas v. GEO Group, Inc.*, *et al.*, 1:19-CV-016-RLY-DLP, filed Jan. 2, 2019) (the 2019 INSD suit) because he was "mislead, misguided, deceived, and persuaded by [his counselor] defendant Whittinghill to file his complaint in the wrong district court, consuming his two year statute of limitation period . . .." [DE 74-1] at 33. An order was entered dismissing that case without prejudice as abandoned for failure to prosecute after Thomas

---

[1] When "the assertion of different charges against different prison officials in the same complaint is confusing," the Seventh Circuit has approved of requiring the plaintiff to "file separate complaints, each confined to one group of injuries and defendants." *Kadamovas,* 706 F.3d at 846. "The joinder of defendants is limited by Fed. R. Civ. P. 20(a)(2)." *Id.*

failed to resolve his filing fee status. *See Thomas*, 1:19-CV-016-RLY-DLP at [DE 7]. However, a final judgment, issued and signed by the Honorable Richard L. Young, was entered on March 11, 2019, which noted the action was "**dismissed with prejudice pursuant to 28 U.S.C. § 1915A(b)**." *See id*. at [DE 8] (emphasis in original). Thomas appealed that judgment, but the appeal was dismissed on June 24, 2020, for lack of prosecution. *Id*. at [DE 16].

## Facts

According to the amended complaint, Thomas entered into the Indiana Department of Correction (IDOC) in 2007 with preexisting diagnoses of schizophrenia, depression, and epilepsy and has had long-standing issues with mental illness, psychiatric disorders, and suicidal ideations ever since. He was originally diagnosed by IDOC as being a prisoner with serious mental illness (SMI), but that status was revoked several times as he was transferred between facilities. On April 20, 2016, after three failed suicide attempts at the Westville Correctional Facility's (WCF) Westville Control Unit (WCU Supermax)—all of which Thomas attributes to decompensation due to 23-hour lockdown in segregation/restricted housing—he was officially re-diagnosed as a prisoner with SMI. His mental status classification code was downgraded to F, and he was immediately transferred to the New Castle Correctional Facility (NCCF), one of IDOC's three prisons with Special Needs Units (SNU) for psychiatric patients.

### New Castle Correctional Facility – April 20, 2016, through March 7, 2017

When Thomas first arrived at NCCF, he asked to speak to a trained mental health nurse during intake, but Nurse Lawson and Dr. Ippel denied that request. Later, Dr. Keris allegedly falsified his medical records when she noted Thomas had admitted faking his mental illness in order to be transferred out of WCU Supermax. On April 29, 2016, Dr. Burdine conducted an out-of-cell interview with him in front of other mentally ill prisoners, wherein she accused him of having a sexual problem with young females, stated he had been arrested for rape, and had attempted to murder his cellmate.

Thomas denied those allegations, but Dr. Burdine entered the allegations into his electronic medical records. As a result of that interview, he was assaulted by another inmate despite having warned staff members—including Unit Team Manager Lowe and Behavior Health Specialist Bouillon—of the danger ahead of time.

From late April 2016 through March 2017, Thomas attended Psychiatric Dialectical Behavioral Therapy (DBT) facilitated by the GEO Group, Inc. During DBT he was cuffed at the wrists and ankles and forced to sit in a chair for two to three hours a day (five days a week). He was not allowed to wear his medically prescribed back brace underneath his restraints during therapy. When he complained about foot pain caused by drinking water at his previous facility, he was threatened with punishment. In general, he was not permitted to go to the gym or law library, and he was denied visitors. He was prescribed Pamelor, an antidepressant, but the rest of his medications were discontinued.[2]

Dr. Burdine, Dr. Pintel, Dr. Keris, Therapist Heimann, and Therapist Shelly personally informed him he was going to be transferred out of NCCF for filing lawsuits against them and other members of the GEO Group, Inc.'s mental health staff. Accordingly, on March 17, 2017—in spite of his long-standing mental illness—he was transferred back to WCU Supermax, where he was subjected to significantly harsher conditions and was again placed on 23-hour lockdown in segregation/restricted housing.

Overall, Thomas alleges IDOC and GEO Group Inc.'s unconstitutional policies, practices, and customs denied him adequate mental health care and subjected him to punitive confinement—including being forced to attend DBT classes while restrained—while he was at NCCF. He further

---

[2] Thomas also alleges Officer Pierce/Pierson attacked him with a dog chain on December 7, 2016, while he was in handcuffs waiting to be escorted to the group room for DBT. Further, on February 2, 2017, Officer Criswell told him he had a small penis and continued to torment him about it.

alleges that their evaluation and classification policies allowed him to be transferred back to a facility with harsher conditions and less mental health care in violation of his Eighth Amendment rights.[3]

### *Westville Correctional Facility, Westville Control Unit Supermax – March 7, 2017, through March 9, 2021*

When Thomas arrived at WCU Supermax on March 7, 2017, he asked to speak with a trained mental health practitioner during intake, but that request was denied by Nurse Hutchinson and Dr. Liaw. Instead, he was placed directly into a 23-hour lockdown restricted housing unit. He describes his cell as concrete with a solid steel door and small window. The cell was poorly lit, and neither the clocks nor the intercom system worked. The water was contaminated from lead piping.[4] No inmates were allowed to leave their cells without first being shackled, cuffed, and restrained. They were permitted to shower three times a week and received new clothing only once a year. There was a small outdoor recreational pad with a pull-up bar, a basketball rim, and a ball with no air. The indoor recreation area had broken bicycles but no other exercise equipment. The restricted housing unit offered no DBT programs or other educational/self-help courses. While at WCU Supermax, Thomas was denied all visitation. His suicidal ideations worsened, but his mental health condition was often ignored.

Thomas alleges WCU Supermax was understaffed—there were only two correctional officers per pod and three supervising officials during intervals, one doctor twice a week, one nurse per twelve-hour shift, one on-call psychiatrist and psychologist, and two mental health professionals for two-hundred-twenty-four inmates. He sues a plethora of IDOC and Wexford Health Source[5]

---

[3] These defendants are listed on page 43 of [DE 74-1].

[4] Thomas alleges he was forced to drink water that was contaminated by the lead piping system at WCF and WCU Supermax, which caused him to have throat pain, fevers, diarrhea, and stomach pain for "weeks at a time." [DE 74-1] at 64. Dr. Liaw gave him intravenous shots for his throat infection, but it did not fix the issues he was having. He alleges all the defendants knew about the contamination—going so far as to drink bottled water themselves—but did not allow the inmates to do the same.

[5] Wexford Health Source (Wexford) began providing medical care for IDOC prisons on April 1, 2017, after IDOC declined to renew Corizon Health's contract.

employees for violating his constitutional rights by "sticking their heads in a hole for fear of what they might see" regarding these conditions. [DE 74-1] at 48.[6] He claims individuals at Wexford, the Administrative Staff at IDOC's central office, and officials at WCF and WCU Supermax all had access to his mental health records and were aware of his preexisting SMI, yet they knowingly subjected him to the dehumanizing, punitive, and isolated conditions described above.

With regard to his mental health care specifically, Thomas met with Dr. Eichman many times throughout his stay at WCU Supermax for medication management and/or psychotherapy. He requested that the meetings be conducted in private, but those requests were denied. He informed her he was hearing voices, the walls seemed to be closing in on him, he was seeing demons, and he could not sleep. His psychotropic medications, antipsychotics, and antidepressants were adjusted, but it did not help. Thomas tried to commit suicide on March 11, 2018, by cutting his wrists with a razor blade. That attempt was covered up, he was placed in a cell with bugs and mice as punishment, and he was given a disciplinary infraction.

Beginning in August of 2018, Dr. Wala directed that inmates on suicide watch should not receive blankets or mattresses. Although Thomas continued to meet with Dr. Eichman, Dr. Wala, and various mental health professionals (MHPs), he attempted suicide again on September 27, 2018, June 23, 2019, and March 14, 2020. Prior to those attempts, Thomas claims he informed many defendants of his mental health issues through personal conversations, letters, and healthcare request forms—over 500 of them were addressed to Dr. Eichman, Dr. Taylor, Dr. Wala, MHP Dalrymple, MHP Faenza, MHP Keeton, MHP Athans, MHP Usdowski, MHP Quinn, and his therapist MHP Boren. Instead of addressing his concerns, he was written up for excessive submissions, sanctioned during disciplinary proceedings, placed in dilapidated cells as punishment, and transferred back and forth between suicide watch and the 23-hour segregation/restricted housing unit.

---

[6] These defendants are listed over two full pages, with no additional facts included. [DE 74-1] at 47–48.

8

While on suicide watch, Thomas was forced to sleep on the floor where he was constantly monitored by a suicide companion. When he was released from suicide watch, he was taken to the "receiving area" and placed in a cell with no toilet or sink. [DE 74-1] at 96. There, pests crawled on him, he had to sleep on a steel bunk with no mattress or blanket, and the lights in the garage area next door stayed on day and night. Throughout this time, he was seen by various doctors and MHPs, but he claims that no real psychological care was given to him. Overall, he was held at WCU Supermax in restricted housing on suicide watch or in 23-hour segregation "indefinitely" without any periodic reviews. *Id*. at 100.

On March 9, 2021, MHP Quinn told him he was being transferred to the Miami Correctional Facility (MCF) because he had filed federal lawsuits, and the following information was entered into his medical record:

> Offender does not utilize mental health services unless the need arises. Offender continues to self-report (AH) Audio Hallucinations and (VH) Visual Hallucinations, often requesting to see psychiatry for (sx) signs. Offender has been able to use positive coping skills will continue to be monitored by mental health and followed up per ITP (Individual Treatment Plan).

[DE 74-2] at 2. Thomas has sued a vast array of administrative officials, correctional officers, and medical professionals associated with WCU Supermax for unconstitutional policies related to his housing placement and for being deliberately indifferent to his mental health needs for over four years while there, which resulted in his numerous suicide attempts.

### *Miami Correctional Facility March 9, 2021, through the Present*

On March 9, 2021, Thomas was transferred to the Miami Correctional Facility (MCF), where he was placed in a segregated/restricted housing unit. He describes the cells in this unit as concrete boxes with a solid steel door and a small window. Inmates are only allowed one shower per week. There are no crisis therapists on the unit, no DBT programs or educational courses, no intercoms, no visitation, and no group out-of-cell gatherings. It is excessively loud all the time.

9

Upon intake, he asked to speak with a mental health professional, but that request was denied by Nurse Hill. The next day during orientation, he told Case Manager Rentzscher and Unit Team Manager Grove he felt suicidal. They responded by telling him there was nothing they could do, and they handed him an indigent kit that contained five razors. During an interview with MHP Miller-Sweet he again raised his suicidal thoughts, but she did not take any action. Later that same day, he told Sgt. Martin he felt suicidal, but Sgt. Martin ignored him. At 4:30 PM on March 10, 2021, Thomas attempted suicide by cutting his wrist with a razor. He was transferred to the infirmary for medical treatment and placed on suicide watch by Nurse Sherri Swearingen and MHP Alexander. However, that cell had no camera or suicide companion. On March 12, 2021, he informed MHP Miller-Sweet and Sgt. Martin that he was hearing voices. They refused to help him, so later that day he cut his left wrist with a razor blade in front of MHP Miller-Sweet. He was taken to the infirmary where he was treated for a superficial laceration and then taken back to the same cell by Sgt. Martin and MHP Miller-Sweet. On March 15, 2021, during a chronic care visit with Dr. Noe Muranda, he explained that he was feeling suicidal and depressed, but Dr. Muranda told him there was nothing he could do. He was released from suicide watch. Thomas claims Wexford and IDOC's policies and practices allowed him to be returned to segregation after his suicide attempts in order to save money. He also claims those policies encouraged staff to write up suicide incidents as disciplinary infractions so they wouldn't have to provide him with appropriate mental health care.

On March 17, 2021, he was scheduled for a tele-visit with Dr. Cisse. She documented his symptoms and noted she would "restart previous antipsychotic for affective dysregulation and impulse control attributed to patient's personality disorder and titrate atypical antidepressant dose." [DE 74-2] at 23. On March 22, 2021, he personally met with A-Housing Unit Team Manager Nathanael Angle and told him about his prior history and current thoughts; he requested to be moved to a cell with a "back window or mental health unit due to two suicidal attempts," but Mr. Angle did

10

nothing. *Id*. at 24. On March 24, 2021, Nurse Crites wrote false information in his medical records to make it seem as if he was fine.

On April 4, 2021, Thomas attempted suicide by hanging. He was immediately taken to the infirmary due to complications breathing. Nurse Swearingen informed MHP Alexander of the situation, and he was placed back on suicide watch in a stripped-down cell with no camera or suicide companion, wearing only a suicide smock. His throat was never treated by Nurse Swearingen, so he couldn't eat and lost weight as a result.

On April 5, 2021, Thomas informed Mr. Angle he was worried about his housing situation due to upcoming "bed moves" he had authorized. [DE 74-2] at 29. Sgt. Beane, Officer Kennedy, Officer Kirby, and Officer Anderson placed a gang-affiliated inmate, Offender Walker, in the cell with him while he was on suicide watch per Mr. Angle's direction. Thomas alleges he informed Mr. Angle he had several altercations in the past with Offender Walker, so he requested protective custody papers but was denied. He was injured during altercations with Offender Walker in the cell on April 5th on two occasions. Neither Mr. Angle nor the officers did anything to prevent the fights. In fact, they placed him back with Offender Walker after to the first incident to "see who would win." *Id*. at 31. He was sprayed with a chemical agent by the officers during the fight. Documentation of Thomas's injuries were lost, and he was written up for battery. That same day, Thomas suffered two grand mal seizures; he was escorted to medical and given pain medication and his inhaler to help him breathe, but Nurse Wilson didn't treat his chemical burns.

Afterwards, he was taken back to the segregated/restricted housing unit and placed with a different offender who had also complained about the conditions at MCF. Thomas alleges the cell was intolerable. There were no lights, "two month old toilet water" and feces covered the floor, chemical spray was all over the back of the door, walls, toilet, and sink area, and the intercom was broken. [DE 74-2] at 34. He was forced to stay in that cell for approximately two months. During that

time, he personally spoke with Warden Hyatte, Assistant Warden Scaife, Unit Teams Managers Angle and Hamrick, and Case Managers Isaac and Croft about the conditions and how they were affecting his mental health, but they refused to move him to a new cell or place him on suicide watch. His written complaints to the MCF Internal Affairs Office and the ombudsman about the conditions were also ignored.

From April to June, Thomas continued to suffer from both physical and mental health conditions. He experienced foot and back pain, allegedly from drinking the contaminated water at WCU Supermax. Dr. Muranda prescribed pain medication and recommended cocoa butter; when that didn't help Nurse Hill prescribed a topical anti-fungal cream. With regard to his mental health, he met with Dr. Cisse in late April and described his deteriorating state of mind. She documented that he was belligerent and abruptly discontinued his psychotropic and antidepressant medications, which made things worse. He asked Nurses Wood, Dunn, Emmila, and Jones if they would speak with Dr. Cisse about restarting his medication, but they refused. He sent multiple health care requests addressed to Dr. Cisse, Dr. Verdon, MHP Miller-Sweet, MHP Alexander, MHP Beck, and Medical Administrator Ivers, informing them about his deteriorating condition and requesting help, but they failed to respond.

On June 22, 2021, he was released back into the general prison population at MCF, without any mental health therapy or medications. Later that day, he informed Nurse Swearingen he was suicidal. He cut his wrists with a razor blade in front of her and Lt. Wells. He was rushed to the infirmary placed on suicide watch. He had a tele-visit with Dr. Cisse, who initially refused to restart his medication but later agreed to do so. MHP Miller-Sweet removed him from suicide watch on June

24, 2021, and he was placed back in segregation/restricted housing per Wexford and IDOC's post-suicide watch policies.[7]

From August through December 2021, he continued to request mental health care and placement in a different facility, but those requests were denied by Dr. Verdon, Dr. Cisse, MHP Beck, Unit Team Manager Dwyer, Unit Team Manager Angle, and Case Manager K. Smith. However, Dr. Cisse agreed to titrate his psychotropic medications upwards. On August 31, 2021, Thomas had a face-to-face encounter with Assistant Warden Payne who "deceived me into thinking he would help me get adequate and appropriate mental health care. Nothing was done." [DE 74-2] at 60. On December 15, 2021, Assistant Warden Scaife told him she would refer him to a mental health program, but that promise was also not fulfilled.

From January through March 2022, Thomas continued to experience a decline in his mental health. Case Manager Carter and Case Manager Price told him there was nothing they could do. Thomas had his first tele-visit with Dr. Pupko on March 9, 2022, and told her about his long-standing SMI and suicidal ideations. He specifically explained that he felt like the walls were closing in, he couldn't breathe or sleep, and he was hearing voices in his head telling him to harm himself and others. She told him Dr. Cisse had recently increased his psychotropic medications, and it just needed time to work. Later that day his symptoms worsened, so he sent healthcare requests to Dr. Pupko, Dr. Verdon, MHP Miller-Sweet, MHP Beck and Medical Administrator Ivers, but no actions were taken. On March 18, 2022, during a tele-visit, Dr. Pupko told him there was nothing she could do unless he actually tried to harm himself or others. He begged for help from Case Manager S. Stoll, Case Manager Singn, MHP Beck, and Nurse F. Parks, but they ignored his requests.

---

[7] Centurion Health was awarded the IDOC contract for prison medical care and began providing services on July 1, 2021.

On April 2, 2022, Thomas again attempted suicide by cutting his wrist with a razor blade. He was rushed to the infirmary, given medical treatment, transferred to the segregation/restricted housing unit, and placed on suicide watch with a camera in the cell. The lights in that cell remained on 24-hours a day. He told MHP Beck he was seeing black dots and experiencing memory loss from the lights, but she refused to move him or let him speak to Dr. Pupko. He was taken off suicide watch on April 4, 2022, and was placed on Centurion's post-suicide follow-up policies. He engaged in a hunger strike, which Dr. Pupko and Assistant Warden Scaife ignored.

From May through August 2022, Thomas continued to experience hallucinations and suicidal ideations. He met with MHP Beck and Dr. Cisse, who adjusted his mediations but refused to transfer him to another facility. He addressed numerous health request forms to Dr. Pupko, Dr. Cisse, Dr. Verdon, Medical Administrator Ivers, MHP Beck, MHP Miller-Sweet, and MHP Sipe, who all turned a blind eye to his requests.[8] On August 31, 2022, he told Sgt. Mays he was going to kill himself, and she said, "I don't care kill yourself." [DE 74-2] at 79. Officer G. Cavazos told him the same thing the next day.

On September 1, 2022, he cut his wrists again with a razor blade. Major Bennet and several other officers sat with him while he was handcuffed outside the nursing station, while Medical Administrator Ivers attempted to stop the bleeding herself. When she couldn't, she became frustrated and injected him with two syringes of medication to calm him down.[9] Thomas claims the injections "locked up my legs for (10) days." [DE 74-2] at 80. Major Bennet and Lt. Calvert covered up the suicide attempt and told him he would not be transferred to another facility. Instead, he was placed back in segregation/restricted housing in a "dry cell" with a camera, no bed, and no toilet. *Id.* at 82. He was forced to sleep on concrete with bugs crawling all over him. Afterwards, he was placed back

---

[8] Thomas also lists additional defendants on page 78 of [DE 74-2] whom he personally informed of his issues during daily medication distribution visits; they all told him they would advise Dr. Pupko of his complaints.

[9] Thomas later indicates that Dr. Cisse ordered the injections.

into his "cold camera cell" on "strip-cell-status" for five days dressed only in a suicide smock, where he received very little water. *Id*. at 83. He was also written-up and sanctioned with a disciplinary infraction. On September 6, 2021, Thomas was taken off of suicide watch by MHP Beck and placed back into the segregation/restricted housing unit per Centurion's post-suicide watch policies. In order to get his legal papers and other personal items back, he falsely told her, "I don't feel I have a mental illness. I'm not suicidal. I'm not hearing voices anymore." *Id*. at 85. On September 13, 2022, Dr. Pupko told Thomas that "they were short of mental health staff" at MCF. *Id*. at 86. On December 1, 2022, Thomas again attempted suicide via razor blade. It was covered up by staff, and after receiving medical treatment, he was returned again to segregation/restricted housing.

Thomas claims MCF, Wexford, Centurion and IDOC's policies and practices of placing post-suicidal and SMI inmates in such conditions are unconstitutional. He claims the MCF Security Confinement Unit is "designed to exacerbate the symptoms that seriously mentally ill prisoners exhibit." [DE 74-2] at 87. He asserts that the defendants failed to protect him from self-harm at MCF and were deliberately indifferent to his mental health needs when they forced him to remain in punitive, prolonged, isolated, solitary confinement despite other available facility options within IDOC better suited to his mental health issues. He has sued multiple defendants in both their individual and official capacities.

**<u>Analysis</u>**

### *<u>Res Judicata</u>*

Because Thomas admits this lawsuit was originally filed and disposed of with prejudice in the Southern District of Indiana, the Court must first examine the claims in light of res judicata. "The doctrine of *res judicata*, or claim preclusion, 'protects the finality' of a judgment and 'prevents parties from undermining it by attempting to relitigate the claim.'" *McDonald v. Adamson*, 840 F.3d 343, 346 (7th Cir. 2016) (citing *Palka v. City of Chicago*, 662 F.3d 428, 437 (7th Cir. 2011)). There are

several requirements for res judicata to apply: "(1) an identity of the parties or their privies; (2) an identity of the causes of actions; and (3) a final judgment on the merits." *Hwy. J Citizens Group v. U.S. Dept. of Transp.*, 456 F.3d 734, 741 (7th Cir. 2006) (quoting *Cent. States, S.E. & S.W. Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 628 (7th Cir. 2002)). If these requirements are met:

> res judicata bars not only those issues which were actually decided in a prior suit, but also all issues which could have been raised in that action. Simply put, the doctrine of res judicata provides that, when a final judgment has been entered on the merits of a case, it is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.

*Id.* (internal quotation marks, italics, and citations omitted).

Turning first to the identity of the causes of actions, it is clear many of Thomas's current claims fall squarely within the confines of the 2019 INSD suit. The claims related to Thomas's stay at NCCF from April 20, 2016, through March 7, 2017, are essentially substantively identical. In both cases, Thomas describes his mental health treatment—or lack thereof—after his transfer from WCU Supermax to NCCF. He faults GEO Group, Inc. and its employees, along with prison administrative and custody staff officials, for subjecting him to cruel and unusual punishment during DBT therapy (while being aware of his chronic physical and emotional issues) and having practices and policies in place that prevented SMI prisoners like himself from getting adequate treatment and/or participating in facility recreation, educational, and other programs. He attributes this, in part, to a lack of employee training and to outright intentional discrimination, which culminated in a retaliatory transfer back to WCU Supermax. *Compare* pgs. 6–8 *supra* with *Thomas*, 1:19-CV-016-RLY-DLP at [DE 1] pgs. 12–19. The earlier lawsuit also explicitly describes the alleged actions by Officer Pierce/Pierson mentioned in footnote 2 above. *See Thomas, id.* at 19–20.

The same is true of the allegations pertaining to Thomas's stay at WCU Supermax after his transfer there on March 7, 2017. The 2019 INSD suit describes the conditions of his confinement at WCU Supermax, including 23-hour segregated lockdown in cells that were small, poorly ventilated, and unsanitary. He describes contaminated water that made him ill. He blames policies and practices instituted and carried out by IDOC officials in Indianapolis along with actions taken by mental health professionals, nurses, and administrative, custody, and security staff at WCF that subjected him to the harsh conditions and lack of adequate treatment there. He asserts the defendants were aware of his physical and mental health issues but failed to address his worsening psychological state which ultimately culminated in several suicide attempts. *Compare* pgs. 9–12 *supra* with *Thomas*, 1:19-CV-016-RLY-DLP at [DE 1] pgs. 20–26. Thus, for all of the claims described above, there is sufficient identity to raise res judicata concerns. *See Hwy. J Citizens Group*, 456 F.3d at 741 (if a claim "emerges from the same core of operative facts as that earlier action," it has sufficient "identity" with the previously litigated matter) (citation omitted).[10]

As to the identity of the parties regarding those claims, many of the defendants directly overlap the two cases. And, for those in the current suit who were not named in the 2019 INSD suit, it is clear that privity exits as they were all employed by either IDOC or its medical service providers. Privity of parties exists when there is a "link between parties in successive suits which share a "clear congruence of legal issues." *Tartt v. Northwest Cmty. Hosp.*, 453 F.3d 817, 823 (7th Cir. 2006) (citing

---

[10] Although the 2019 INSD suit's allegations cease as of December 3, 2018—the date Thomas signed his complaint—and the current allegations pertaining to his stay at WCU Supermax run through March 9, 2021, nothing in his amended complaint regarding WCU Supermax exceeds the scope of issues that could have been raised in the original action. *See Hwy. J Citizens Group*, 456 F.3d at 741. Moreover, even if he had alleged sufficient details to support a claim for events that occurred at WCU Supermax between the filing of the INSD suit and March 9, 2021, they would belong in a separate lawsuit. *See George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) ("Unrelated claims against different defendants belong in different suits . . .."); *see also Kadamovas*, 706 F.3d at 846 (When "the assertion of different charges against different prison officials in the same complaint is confusing," the Seventh Circuit has approved of requiring the plaintiff to "file separate complaints, each confined to one group of injuries and defendants.").

*Studio Art Theatre of Evansville, Inc. v. City of Evansville*, 76 F.3d 128, 131 (7th Cir. 1996). Such is the case here.

Finally, the 2019 INSD suit constitutes a final judgment on the merits for purposes of res judicata. Although the original dismissal order indicated the 2019 INSD case was dismissed as abandoned for failure to prosecute, the final judgment—which was signed by the judge—indicates it was dismissed with prejudice pursuant to 28 U.S.C. § 1915A(b), which states in part that, upon review, the court must "dismiss the complaint . . . if [it] is frivolous, malicious, or fails to state a claim upon which relief may be granted [or] seeks monetary relief from a defendant who is immune from such relief." Whether the 2019 INSD suit was dismissed for failure to prosecute or because the complaint was lacking in some respect, it is clear that the final judgment was with prejudice. And, either way, an entry of judgment dismissing the case for failure to state a claim or for a failure to prosecute or comply with a court order "amounts to a final judgment on the merits for res judicata purposes." *Tartt v. Northwest Cmty. Hosp.*, 453 F.3d 817, 822 (7th Cir. 2006). If Thomas felt that final judgment was entered in error, his remedy was to appeal that case, not to bring a new suit.[11]

Thus, all claims (and related defendants from NCCF and WCF) pertaining to Thomas's stay at NCCF from April 20, 2016, through March 7, 2017, and at WCU Supermax from March 7, 2017, through March 9, 2021, will be dismissed because they are barred by res judicata.

### Remaining Claims – Constitutionally Inadequate Medical Care

This leaves Thomas's current claims regarding MCF from March 9, 2021, to the present. Inmates are entitled to adequate medical care under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To state a claim, a prisoner must allege (1) he had an objectively seriously medical need and (2) the defendant acted with deliberate indifference to that medical need. *Id.* A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one

---

[11] In fact, as noted above, Thomas did appeal that judgment, but the appeal was dismissed for lack of prosecution.

that is so obvious even a lay person would recognize as needing medical attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). On the second prong, inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267. This includes appropriate measures to address the risk of self-harm from suicide. *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 565 (7th Cir. 2021). Courts generally "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citation and internal quotation marks omitted).

At the same time, a prisoner is not required to show that he was "literally ignored" to establish deliberate indifference. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). "[I]nexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference," particularly where "that delay exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (citations and internal quotation marks omitted). Additionally, a "prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011).

Here, Thomas has alleged a serious medical need, namely, severe mental illness that led him to make multiple suicide attempts while at MCF. He asserts Dr. Muranda, Dr. Cisse, Dr. Verdon, Dr. Pupko, MHP Miller-Sweet, MHP Alexander, MHP Beck, MHP Sipe, Nurse Hill, Nurse Swearingen, Nurse Crites, Nurse Parks, Nurse Templin, and Medical Administrator Ivers—all of whom are described as either medical or mental health professionals at MCF—were aware of his worsening

condition after his arrival yet failed to provide him with constitutionally adequate mental health treatment and/or failed to appropriately address his risk of self-harm.

Additionally, Thomas alleges Former Warden Hyatte, Assistant Warden Payne, Assistant Warden Scaife, Unit Team Manager Angle, Unit Team Manager Grove, Unit Team Manager Hamrick, Case Manager Rentzscher, Case Manager Isaac, Case Manager Croft, and Sgt. Martin—all of whom are described as prison officials or employees at MCF—knew about his past SMI issues and were personally informed Thomas was experiencing suicidal ideations due to his lack of treatment and harsh living conditions at MCI yet acted with deliberate indifference to his serious medical needs by failing to take any action to address the problems and by forcing him to remain in administrative segregation/restricted housing at MCF. Giving Thomas the benefit of the inferences to which he is entitled at this stage, he will be permitted to proceed past the pleading stage against these defendants in their individual capacities for monetary damages for violating the Eighth Amendment by being deliberately indifferent to Thomas's mental health needs.[12]

Similarly, Thomas alleges Regional Director Becky Hess, Commissioner Robert E. Carter, Jr., Deputy Commissioner James Basinger, Director of Classification Jack Hendrix, Director of Special Needs Population Amy Eichmeier, and Director of Mental Health Cara Misetic[13]—all described as IDOC administrative staff officials in the central office in Indianapolis—had access to his lengthy medical/clinical records and were aware that "placing a seriously mentally ill prisoner in

---

[12] With regard to his specific physical ailments, he alleges he experienced back and foot pain from previous exposure to contaminated water plus pain from chemical burns following an altercation with another inmate. However, he states the medical professionals involved in that care provided him prescribed pain medication, stretching exercises, and various creams, so he hasn't plausibly alleged they were deliberately indifferent to his needs. He also claims Medical Administrator Ivers injected him with medication during a suicide attempt on September 1, 2022, which caused his legs to be frozen for ten days, but he admits that the medication was prescribed by Dr. Cisse and was part of his mental health care. Therefore, these claims will be dismissed.

[13] Thomas also names IDOC's former Commissioner, Bruce Lemmon, as a defendant. However, according to IDOC's website, Lemmon announced his retirement effective November 30, 2016, long before the events at or associated with MCF are alleged to have occurred. *See* https://www.in.gov/idoc/files/IDOC-COMMISSIONER-BRUCE-LEMMON-HANGS-UP-THE-KEYS-AFTER-40-YEARS.pdf (last visited March 6, 2025). As such, he will be dismissed from this lawsuit.

extensive, prolong[ed], punitive, solitary, isolation" would harm his mental health. [DE 74-2] at 8. They knew, or should have known, that placement at MCF—a facility with no specialized mental health treatment options onsite even though IDOC has other facilities with such specialized units available—would exacerbate his mental condition and lead to the suicidal ideations and attempts he experienced. Although further investigation may show a lack of personal involvement by these officials, giving Thomas the benefit of the inferences to which he is entitled at this stage, he will be permitted to proceed past the pleading stage against these defendants in their individual capacities for monetary damages for violating the Eighth Amendment by being deliberately indifferent to Thomas's mental health needs.[14]

In addition, Thomas's complaint can be read to seek injunctive relief related to his ongoing need for care. The current Warden of MCF has both the authority and the responsibility to ensure that inmates at the facility are provided constitutionally adequate medical treatment as required by the Eighth Amendment. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). Therefore, Thomas will be allowed to proceed on an Eighth Amendment claim against the current Warden of MCF in his official capacity for injunctive relief related to his ongoing need for mental health treatment.

### Remaining Claims – Failure to Protect

The Eighth Amendment also imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates" and to "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). However, "prisons are dangerous places," as "[i]nmates get there by violent acts, and many prisoners have a propensity to commit

---

[14] Thomas lists Classification Analysts Janet O'Neal and Derek Christian as defendants in the caption of his amended complaint, but he doesn't describe any actions taken by them, nor does he list them along with the administrative defendants in the body of his complaint. He also mentions several "unknown" administrative defendants in the body of his complaint ([DE 74-2] at 8), but he doesn't list them as defendants in the caption. For purposes of clarity, these defendants will be dismissed.

more." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). Therefore, a failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005). Instead, the plaintiff must establish that "the defendant had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010). This is a high standard. As the Seventh Circuit has explained:

> To establish deliberate indifference on the part of the defendants sued individually, [plaintiff] needed to show that the officers acted with the equivalent of criminal recklessness, in this context meaning they were actually aware of a substantial harm to [plaintiff's] health or safety, yet failed to take appropriate steps to protect him from the specific danger. [Plaintiff] testified during his deposition that he told officers twice . . . that he was afraid for his life and he wanted to be transferred off the tier. . . . In *Butera*, we deemed the inmate's statements insufficient to give notice to the officers because they did not provide the identities of those who threatened the inmate, nor state what the threats were. . . . This lack of specificity falls below the required notice an officer must have for liability to attach for deliberate indifference.

*Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008) (internal citations and footnote omitted). In addition, "negligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to establish an Eighth Amendment violation. *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020).

Here, Thomas alleges he personally informed Unit Team Manager Angle, Sgt. Beane, Officer Kirby, Officer Anderson, and Officer Kennedy that his life was in danger because he had been placed in a cell with a specific, gang-affiliated inmate whom he'd had several previous altercations with. Mr. Angle refused to give him paperwork to request protective custody, and he was subsequently beaten by the other inmate. Instead of intervening at that point, Mr. Angle and the officers placed him back in the same cell with the other inmate, and Thomas was beaten again while they all stood by and watched. Giving Thomas the benefit of the inferences to which he is entitled at this stage, he has

plausibly alleged Unit Team Manager Angle, Sgt. Beane, Officer Kirby, Officer Anderson, and Officer Kennedy had actual knowledge of an easily preventable impending harm when he was attacked by Offender Walker on April 5, 2021, and they either failed to prevent it or actively facilitated it. Therefore, Thomas will be allowed to proceed on Eighth Amendment failure to protect/intervene claims against these defendants in their individual capacities for monetary damages.

### Remaining Claims – Conditions & Indefinite Placement

Thomas further alleges his placement in indefinite segregation/restricted housing for many years while at MCF violated his Fourteenth and Eighth Amendment rights. The Fourteenth Amendment provides state officials shall not "deprive any person of life, liberty, or property, without due process of law . . .." U.S. Const. amend. XIV, § 1. That said, due process is only required when punishment extends the duration of confinement or imposes "an atypical and significant hardship on him in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Seventh Circuit has "concluded that inmates have no liberty interest in avoiding transfer to discretionary segregation—that is, segregation imposed for administrative, protective, or investigative purposes." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008) (citing *Lekas v. Briley*, 405 F.3d 602, 608–09 & 608 n.4 (7th Cir. 2005) ("[R]eassignment from the general population to discretionary segregation does not constitute a deprivation of a liberty interest.")); *see also DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992) ("[P]risoners possess neither liberty nor property in their classifications and prison assignments."); *Healy v. Wisconsin*, 65 Fed. Appx. 567, 568 (7th Cir. 2003) ("[I]nmates do not have a protected liberty interest in a particular security classification.") (citing *Sandin*, 515 U.S. at 486).

Although later cases have questioned the conclusion that placement in nonpunitive segregation can "*never* implicate a liberty interest," *see Williams v. Brown*, 849 Fed. Appx. 154, 157, n.3 (7th Cir. 2021) (emphasis added), timing plays a part in the analysis, even when conditions are

significantly harsher. *See e.g., Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) ("Prisoners do not have a constitutional right to remain in the general population, but both the duration *and* the conditions of the segregation must be considered in determining whether due process is implicated.") (internal quotation marks, parenthesis, and citations omitted; emphasis in original); *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697-98 & nn.2–3 (7th Cir. 2009) (collecting cases that held segregation of two to ninety days does not trigger due process concerns and stating, "In a number of other cases, we have explained that a liberty interest may arise if the length of segregated confinement is substantial *and* the record reveals that the conditions of confinement are unusually harsh.") (emphasis added); *Lekas*, 405 F.3d at 612 (finding that up to ninety days in segregation does not affect liberty); *see also Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (recognizing "duration" is a component that plays a part in determining whether a liberty interest exists).

The Eighth Amendment, on the other hand, prohibits conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citations omitted). In evaluating an Eighth Amendment claim, courts conduct both an objective and a subjective inquiry. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong asks whether the alleged deprivation is "sufficiently serious" that the action or inaction of a prison official leads to "the denial of the minimal civilized measure of life's necessities." *Id.* (citations omitted). Although "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), inmates are entitled to adequate food, clothing, shelter, bedding, hygiene materials, and sanitation. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). On the subjective prong, the prisoner must show the defendant acted with deliberate indifference to the inmate's health or safety. *Farmer*, 511 U.S. at 834. As the Seventh Circuit has explained:

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotation marks omitted).

Thomas was moved between suicide watch and segregation/restricted housing for years while at MCF. He claims the following IDOC administrative officials—Regional Director Becky Hess, Commissioner Robert E. Carter, Jr., Deputy Commissioner James Basinger, Director of Classification Jack Hendrix, Director of Special Needs Population Amy Eichmeier, and Director of Mental Health Cara Misetic—plus the following MCF officials and medical staff—Former Warden Hyatte, Assistant Warden Payne, Assistant Warden Scaife, Classification Director T. Worden, Classification Supervisor A. Tobin, Unit Team Manager Angle, Case Manager Hamrick, Case Manager Isaac, Dr. Marandet and Dr. Cisse were all aware of or turned a blind eye towards the conditions in the suicide watch cells and the segregation/restricted housing unit. Those conditions as described above—which include tiny cells with only a small window, uncomfortable beds (and sometimes no beds at all), broken intercoms and light fixtures, pests that crawled all over, infrequent ability to shower, no crisis therapists, no DBT programs or educational courses, no visitation, and no out-of-cell gatherings—combined with the defendants' awareness of Thomas's serious mental health issues, plausibly imposed both an atypical and significant hardship upon him and denied him the minimal civilized measure of life's necessities. Accordingly, giving Thomas the benefit of the inferences to which he is entitled at this stage, he will be permitted to proceed past the pleading stage against these defendants in their individual capacities for violating the Eighth and Fourteenth Amendments by placing him in unconstitutional conditions.

*Remaining Claims – Unconstitutional Policies, Practices, and Customs*

Thomas alleges that unconstitutional policies, practices, and customs are in place at MCF as promulgated by Wexford and Centurion that have caused him harm. Both entities are private companies that either were or are under contract to provide medical care to inmates housed at MCF.[15] A private company performing a state function can be held liable to the same extent as a municipal entity under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). *See Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (*Monell* framework applies to private company providing medical care at correctional facility). But a corporation "cannot be held liable under § 1983 on a *respondeat superior* theory." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). Rather, corporate liability exists only "when execution of a [corporation's] policy or custom . . . inflicts the injury." *Id*. A corporation can be held liable for "an express policy that, when enforced, causes a constitutional deprivation." *Id*. Absent an unconstitutional policy, corporate liability may be established with a showing of "a widespread practice that, although not authorized by written law or express [corporate] policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir. 1995). The policy or custom must be the "moving force behind the deprivation of his constitutional rights." *Johnson v. Cook Cty.*, 526 F. App'x 692, 695 (7th Cir. 2013).

Here, Thomas alleges Wexford and Centurion had and/or have policies that encourage their staff to put SMI inmates in "prolong[ed], punitive, solitary, isolation . . . to save money, despite other alternative and/or (IDOC's) specialized mental health units." [DE 74-2] at 4. Specifically, he alleges these practices, policies, and customs kept SMI prisoners housed in solitary confinement even if the inmate had recently attempted suicide. He also insists it was their custom to deny SMI inmates

---

[15] Wexford provided services at IDOC facilities from April 1, 2017, to June 30, 2021. Centurion began providing services on July 1, 2021, and continues to the present day.

adequate mental health treatment overall as is evidenced by the lack of care he and other inmates received. Giving Thomas the benefit of the inferences to which he is entitled at this stage, he will be permitted to proceed past the pleading stage against Wexford and Centurion on *Monell* claims for having unconstitutional policies, practices, and/or customs in place at MCF related to the classification, placement, and mental health treatment of SMI inmates.[16]

### Dismissals of Remaining Claims/Defendants

As a final note, the court has sifted through Thomas's excessively lengthy allegations—which undoubtedly violate Rule 8—in an attempt to determine whether any valid claims exist and, if so, what they are. *See Jennings*, 910 F.2d at 1436. Unnecessary "surplusage" was ignored. *See Kadamovas,* 706 F.3d at 844. For example, in many instances defendants were only listed in the caption of the complaint but not in the body. Or defendants were only mentioned in the body of the complaint with a long string of defendants alleged to have violated his rights, but no other facts were alleged to tie them to specific claims. Accordingly, any defendants and/or claims not listed in the analysis section above will be dismissed. *See Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (internal quotation marks and citation omitted); *see also George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007) ("Only persons who cause or participate in the violations are responsible.").

---

[16] He also seeks to hold various IDOC officials liable in their official capacities for those same policies, practices, and/or customs. "[A]n official capacity suit is another way of pleading an action against an entity of which the officer is an agent." *Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011). In this case, the entity is IDOC, which is a state agency. Thus, the Eleventh Amendment bars these official capacity claims for monetary damages. *See Thomas v. Illinois*, 697 F.3d 612, 613 (7th Cir. 2012) ("The suit is against a state and a state agency and Congress did not abrogate the states' sovereign immunity from suit under section 1983, as it could have done.") (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66–70 (1989)); *see also Meadows v. State of Ind.*, 854 F.2d 1068, 1069 (7th Cir. 1998) ("The [Eleventh] amendment specifically bars official-capacity suits against state officials because the state is the real party in interest in such suits.").

*Miscellaneous Motions*

Thomas has filed multiple miscellaneous motions. He requests a status hearing [DE 100, 101, 102, 103, 104, 115] and a trial [DE 108, 110, 113] but those requests are unnecessary at this stage of the litigation. Now that the case has been screened for a second time, the Court will issue a written status report and scheduling order once the defendants have answered the amended complaints. Similarly, a trial will be set at a later date if applicable. Thomas has also filed motions for docket sheets [DE 109, 111, 112], but these motions are moot as he has recently been sent a docket sheet by the clerk. *See* [DE 117]. Accordingly, Thomas's miscellaneous motions will be denied.

## Conclusion

For these reasons, the Court:

(1)    **DIRECTS** the Clerk of the Court to separately docket [DE 74-1 & 74-2] as the Amended Complaint prior to docketing this order;

(2)    **DENIES** the miscellaneous motions [DE 100, 101, 102, 103, 104, 108, 109, 110, 111, 112, 113, 115];

(3)    **GRANTS** Leonard Thomas leave to proceed against Dr. Muranda, Dr. A. Cisse, Dr. Verdon, Dr. Pupko, Mental Health Professional K.S. Miller-Sweet, Mental Health Professional Alexander, Mental Health Professional Beck, Mental Health Professional Sipe, Intake Nurse Hill, Nurse Swearingen, Nurse C. Crites, Nurse F. Parks, Nurse D. Templin, and Medical Administrator Lee Ivers in their individual capacities for monetary damages for failing to provide him with constitutionally adequate treatment for his severe mental illness in violation of the Eighth Amendment while at the Miami Correctional Facility from March 9, 2021, through the present;

(4)    **GRANTS** Leonard Thomas leave to proceed against Former Miami Correctional Facility Warden William Hyatte, Assistant Miami Correctional Facility Warden George Payne, Assistant Miami Correctional Facility Warden J. Scaife, Unit Team Manager Nathanael Angle, Unit Team Manager Grove, Case Manager Tim Hamrick, Case Manager Rentzscher, Case Manager J. Isaac, Case Manager Croft, and Sgt. Martin in their individual capacities for monetary damages for being deliberately indifferent to his severe mental illness in violation of the Eighth Amendment while at the Miami Correctional Facility from March 9, 2021, through the present;

(5)    **GRANTS** Leonard Thomas leave to proceed against IDOC Regional Director Becky Hess, IDOC Commissioner Robert E. Carter, Jr., IDOC Deputy Commissioner James Basinger, IDOC Director of Classification Jack Hendrix, IDOC Director of Special Needs Population Amy Eichmeier, and IDOC Director of Mental Health Cara Misetic in their individual capacities for monetary damages for transferring him to the Miami Correctional Facility on March 9, 2021, and being deliberately indifferent to his severe mental illness in violation of the Eighth Amendment while there from March 9, 2021, through the present;

(6)    **GRANTS** Leonard Thomas Leave to proceed against the current Warden of the Miami Correctional Facility in his official capacity for injunctive relief to ensure he receives constitutionally adequate treatment for his severe mental illness while at the Miami Correctional Facility;

(7)    **GRANTS** Leonard Thomas leave to proceed against Unit Team Manager Nathanael Angle, Sgt. Beane, Officer K. Kirby, Officer J. Anderson, and Officer M. Kennedy in their individual capacities for monetary damages for failing to protect him from being attacked by Offender Walker on April 5, 2021, in violation of the Eighth Amendment;

29

(8)    **GRANTS** Leonard Thomas leave to proceed against IDOC Regional Director Becky Hess, IDOC Commissioner Robert E. Carter, Jr., IDOC Deputy Commissioner James Basinger, IDOC Director of Classification Jack Hendrix, IDOC Director of Special Needs Population Amy Eichmeier, and IDOC Director of Mental Health Cara Misetic, Former Miami Correctional Facility Warden William Hyatte, Assistant Miami Correctional Facility Warden George Payne, Assistant Miami Correctional Facility Warden J. Scaife, Classification Director T. Worden, Classification Supervisor A. Tobin, Unit Team Manager Nathanael Angle, Case Manager Tim Hamrick, Case Manager J. Isaac, Dr. Muranda, and Dr. A. Cisse in their individual capacities for monetary damages for placing and/or leaving him in indefinite segregation/restricted housing and for being deliberately indifferent to those conditions of confinement while housed at the Miami Correctional Facility in violation of the Due Process Clause of the Fourteenth Amendment and/or the Eighth Amendment from March 9, 2021, through the present;

(9)    **GRANTS** Leonard Thomas leave to proceed against Wexford of Indiana on a *Monell* claim for having unconstitutional policies, practices, and/or customs related to the classification, placement, and treatment of seriously mentally ill inmates at the Miami Correctional Facility from April 1, 2017, to June 30, 2021;

(10)    **GRANTS** Leonard Thomas leave to proceed against Centurion Health Service on a *Monell* claim for having unconstitutional policies, practices, and/or customs related to the classification, placement, and treatment of seriously mentally ill inmates at the Miami Correctional Facility from July 1, 2021, to the present;

(11)    **DISMISSES** all other claims;

(12)    **DISMISSES** all other defendants;

(13)    **DIRECTS** the Clerk of the Court to request Waiver of Service from (and if necessary, the United States Marshals Service to serve process on) IDOC Regional Director Becky Hess, IDOC Commissioner Robert E. Carter, Jr., IDOC Deputy Commissioner James Basinger, IDOC Director of Classification Jack Hendrix, IDOC Director of Special Needs Population Amy Eichmeier, IDOC Director of Mental Health Cara Misetic, the current Warden of the Miami Correctional Facility, Former Miami Correctional Facility Warden William Hyatte, Assistant Miami Correctional Facility Warden George Payne, Assistant Miami Correctional Facility Warden J. Scaife, Classification Director T. Worden, Classification Supervisor A. Tobin, Unit Team Manager Nathanael Angle, Unit Team Manager Grove, Case manager Tim Hamrick, Case Manager Rentzscher, Case Manager J. Isaac, Case Manager Croft, and Sgt. Martin, Sgt. Beane, Officer K. Kirby, Officer J. Anderson, and Officer M. Kennedy at the Indiana Department of Correction, with a copy of this order and the amended complaint, pursuant to 28 U.S.C. § 1915(d);

(14)    **DIRECTS** the Clerk of the Court to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Dr. Muranda, Dr. A. Cisse, Dr. Verdon, Dr. Pupko, Mental Health Professional K.S. Miller-Sweet, Mental Health Professional Alexander, Mental Health Professional Beck, Mental Health Professional Sipe, Intake Nurse Hill, Nurse Swearingen, Nurse C. Crites, Nurse F. Parks, Nurse D. Templin, and Medical Administrator Lee Ivers at Wexford of Indiana, LLC, and/or Centurion Health Service with a copy of this order and the amended complaint pursuant to 28 U.S.C. § 1915(d);

(15)    **ORDERS** the Indiana Department of Correction, Wexford of Indiana, LLC, and Centurion Health Service to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information;

31

(16)    **ORDERS**, pursuant to 42 U.S.C. § 1997e(g)(2), the above-named defendants to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

SO ORDERED on March 7, 2025.

s/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN, JUDGE
UNITED STATES DISTRICT COURT